**ORIGINAL**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.

**03 - 61553**

**CIV - SEITZ**

MAGISTRATE JUDGE
BANDSTRA

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

DAVID GANE, JEFFREY D. WELSH,
SOUTHERN FINANCIAL SERVICES,
INC., SOUTHERN WASTE, INC., dba
STRATEGIC INVESTORS GROUP,
CHARLES T. TAMBURELLO, and
CAPITAL RESEARCH GROUP, INC.,

Defendants.

### COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1.       This action involves the fraudulent manipulation of Dicom Imaging Systems, Inc.'s common stock in 1999 and 2000 by its former president, Dr. David Gane, and the following stock promoters that Gane hired to promote Dicom stock: Jeffrey D. Welsh, Southern Financial Services, Inc., Southern Waste, Inc., dba Strategic Investors Group, Charles T. Tamburello, and Capital Research Group, Inc. (collectively the "Stock Promoters"). Gane and the Stock Promoters (collectively the "Defendants") made materially false and misleading public statements regarding Dicom's future revenues and earnings in press releases, a package of financial information, mass e-mails ("spam"), faxes, and/or interviews of Gane that were broadcast on television and placed on the Internet. Even though Dicom had failed to meet its internal financial projections – which stated that it

would generate $24.7 million in revenues, and $19.7 million in earnings, in its first three years of operation – and even though Dicom had generated losses in the first six months, the Defendants continued to repeat the projections publicly.  In fact, Gane even increased his revenue projection to $50 million and $60 million.  The defendants kept repeating the projections, or even higher ones, even though they knew, or were reckless in not knowing, that Dicom was not meeting its initial projections.  In addition, the Stock Promoters, whom Dicom paid to tout its stock, failed to disclose all of the compensation that they received for their services.  Finally, the Stock Promoters set increasingly higher stock price targets and recommended that investors buy Dicom stock, but they failed to disclose their practice of selling their own Dicom shares, after issuing their recommendations, into the artificially inflated market that they and Gane created.  This practice is known as "scalping" and resulted in the Stock Promoters making over $1.1 million in stock trading proceeds.

2.     The Defendants' conduct violated the antifraud provisions of the federal securities laws, and the Stock Promoters' failure to disclose all of the compensation that they received to tout Dicom's stock violated the anti-touting provisions.  By this action, the Commission seeks injunctive relief and civil penalties against all of the Defendants, as well as disgorgement and prejudgment interest against the Stock Promoters.  In addition, the Commission seeks to bar Gane from acting as an officer or director of any publicly traded company.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa.  The Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of

the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

4.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this District.

### THE DEFENDANTS

5.      Dr. David Gane, D.D.S. ("Gane"), age 49, resides in White Rock, British Columbia, Canada. Gane is a Canadian citizen. Gane was the CEO, president and a director of Dicom. He is now an officer of a publicly traded company where his responsibilities are sales and marketing of dental imaging products.

6.      Jeffrey D. Welsh ("Welsh"), age 53, resides in Boca Raton, Florida. Welsh is the president of SFS and controls all of its shares. Welsh was the president of SIG and controls 60% of SIG stock through SFS. Welsh was previously licensed to practice law in New York and Florida, but his licenses have lapsed. Welsh had a practice of selling Dicom shares, through an account in the name of SFS and without disclosure, after he and either SFS or SIG recommended that investors buy Dicom shares.

7.      Southern Financial Services, Inc. ("SFS") is a Florida corporation with offices in Boca Raton, Florida. SFS is a financial consulting firm that advises start-up companies on how to raise equity capital and become listed on the Over-The-Counter Bulletin Board ("OTCBB").

8.      Southern Waste, Inc., dba Strategic Investors Group ("SIG") is a Florida corporation that shares office space with SFS. SFS owns 60% of SIG shares. SIG is a financial public relations firm that primarily represents small start-up companies.

\*

- 3 -

9.    Charles T. Tamburello ("Tamburello"), age 30, resides in Weston, Florida.  Tamburello is the founder, president and CEO of CRG.  He formerly held Series 7 and 63 licenses until he gave them up in 1994.  Tamburello had a practice of selling Dicom shares, through an account in the name of CRG and without disclosure, after he and CRG publicly recommended that investors buy Dicom shares.

10.   Capital Research Group, Inc. ("CRG") is a Florida corporation that operates out of Weston, Florida.  CRG is an investor relations firm that represents companies whose stock is publicly traded.  CRG promotes its clients companies on its website at www.thesubway.com.

### THE RELATED NON-PARTIES

11.   Dicom Imaging Systems, Inc. ("Dicom") was a Nevada corporation incorporated in March 1999.  Dicom's principal offices were located in White Rock, British Columbia, Canada and Blaine, Washington.  Dicom was formerly a provider of dental imaging software.  Dicom ceased operations on or about September 4, 2001.  From November 1999 through December 2001, Dicom's stock was registered pursuant to Section 12(g) of the Exchange Act and was quoted on the OTCBB under the symbol DCIM.  On or about December 27, 1999 and again on April 6, 2000, Dicom effected separate 3-for-1 stock splits.  A stock split occurs when an issuer, such as Dicom, issues new shares of stock and in turn lowers the stock's trading price to a level that is proportionate to pre-split prices. But an investor's percentage ownership of the company remains the same as before the stock split because the investor receives new shares to maintain his ownership percentage.  Unless otherwise noted, the prices contained in this Complaint are adjusted so that they all conform to the price after December 27, but before the April 6, splits.

\*

\*

- 4 -

## THE FRAUDULENT SCHEME

### Gane Has Dicom Hire the Stock Promoters

12.     In May 1999, Gane began to negotiate a consulting agreement with
Welsh to engage SFS as financial public relations counsel.  During the
negotiations, Gane provided Dicom's business plan to Welsh so that he, SFS, and
SIG would have background information on the company.  The business plan
contained pro forma financials that projected future revenues based on Dicom's
purported products, some of which were still in development.  The business plan
disclosed this information on the pages containing the projections, so Welsh, SFS,
and SIG knew, or were reckless in not knowing, that the projected revenues were
based on products which were still in development.

13.     On June 29, 1999, Dicom entered into an agreement with SFS under
which SFS agreed to act as financial public relations counsel and make Dicom
known to the financial community.  SFS further agreed to retain an investor
relations firm, SIG, and to approve all press releases concomitantly with the
company.  SFS agreed to prepare and distribute a Dicom financial information
package ("due diligence package") to stock brokers and potential investors in
return for $5,000 from Dicom.  SFS also received $5,000 per month for acting as
Dicom's financial public relations counsel.  SFS also received 30,000 Dicom
shares and options for up to 100,000 more shares from a third party.  SFS and SIG
split the $5,000 per month and the stock, but not the money for the due diligence
package.

14.     Welsh prepared the Dicom due diligence package based upon the
business plan that Gane supplied.  SFS stated in the due diligence package that
Dicom would generate revenues of $24.7 million, and earnings of $19.7 million, in
the first three years and that Dicom would earn $1.51 per share in the first year,
$3.07 in its second year, and $3.61 in its third year.  The due diligence package,
however, did not disclose that approximately $4.2 million, or 17%, of the revenue

projections was based on products that were still in development as set forth in the business plan. Dicom and SFS distributed the due diligence package from November 1999 onwards to stock brokers and potential investors who requested the information.

15.     On November 23, 1999, Dicom entered into a six-month consulting agreement with CRG, which Tamburello prepared. The agreement stated that CRG sought to make Dicom's "products and financial prospects known not only to individual investors but also broker-dealers, market makers and other members of the financial community." In return, Dicom agreed to pay CRG $5,000 upon execution of the agreement and $5,000 on the first day of each month for the next five months. CRG also received 25,000 Dicom shares from a third party. Gane supplied CRG, through Tamburello, with copies of Dicom's updated business plan, which did not contain a copy of the pro forma financials, or the disclosure that some of Dicom's products were still in development. Gane also supplied the due diligence package to CRG so that it would have some background on the company.

### The Promoters Tout Dicom's Stock Without Adequate Disclosure
### Touts by Welsh, SFS, and SIG before Dicom's Financial Restatement

16.     Welsh, SFS, and SIG prepared and distributed purported investment opinions ("Investment Opinions") regarding Dicom through the Internet or wire service on November 23, December 20, and December 28, 1999. SIG's November 23 Investment Opinion selected Dicom as its pick of the month and predicted that its stock price would go significantly higher in the next ninety (90) days. SFS's December 20 Investment Opinion noted Dicom's strong management team and its $1.51 per share earnings projection and set a $10 per share price target for the short-term. SIG's December 28 Investment Opinion hailed Dicom's marketing plan and set a short-term target price of $15 per share.

*

- 6 -

17.     Even though the November 23 and December 28 Investment Opinions described Dicom's stock as an investment, a practice known as "touting," neither of the Investment Opinions disclosed any of the compensation SIG received.  The December 20 Investment Opinion disclosed that SFS received 750 Dicom shares per month and that it or its employees might have stock positions in the company and that they might buy or sell shares.  There was no mention, however, that SFS was to receive 30,000 Dicom shares, $5,000 for a due diligence report, $5,000 per month and options for up to 100,000 additional Dicom shares.  Indeed, throughout the scheme, Welsh, SFS, and SIG failed to disclose in the Investment Opinions all of the compensation that they were to receive from Dicom.  Indeed, they never disclosed the monetary compensation they received from Dicom.

18.     In addition, from November 1999 through March 2000, Welsh, SFS, and SIG only disclosed that SFS or its employees might have stock positions in Dicom and that they might buy or sell shares.  They did this even though, throughout the scheme, Welsh through SFS had a practice of selling Dicom shares into the artificially inflated market that he helped create with the Investment Opinions.

19.     Finally, none of the Investment Opinions disclosed that the revenue projections were based in part upon products that were still in development.

**Touts by Tamburello and CRG before Dicom's Financial Restatement**

20.     Tamburello and CRG distributed Investment Opinions written by Tamburello on December 2, 14, and 28, 1999, through spam and a wire service. The Investment Opinions described Dicom's business, repeated its financial projections for the next two years, and projected that Dicom's short-term share price would be $6.67 (December 2), $8.33 (December 14), $12 (December 28 and January 5) and $15 (January 11).  The Investment Opinions each stated that Dicom

*

- 7 -

is "a great buy" and that the Investment Opinions were for "experienced risk tolerant investors."

21.     Even though the Investment Opinions touted Dicom's stock, CRG disclosed some, but not all, of the compensation for which it had contracted. Specifically, none of the Investment Opinions disclosed either that CRG received $5,000 under the consulting agreement or that it would receive $5,000 per month for an additional five months.  Instead, the December 1999 Investment Opinions only disclosed CRG's receipt of 25,000 Dicom shares, and the January 2000 Investment Opinions provided even less disclosure by falsely stating that CRG received only 20,000 shares.  Throughout the scheme, the Investment Opinions failed to disclose all of the compensation that Tamburello and CRG received, namely the monetary compensation from Dicom.

22.     Moreover, the Investment Opinions failed to disclose throughout the scheme that CRG's principal – Tamburello – would be selling Dicom shares after issuing the Investment Opinions through an account in CRG's name.  Tamburello and CRG only disclosed that it or its employees might have stock positions in Dicom and that they might buy or sell Dicom shares.

### DICOM'S STOCK PRICE RISES AND THE STOCK PROMOTERS SELL

23.     As a result of Dicom's and the Promoters' efforts, Dicom's stock price began to increase.  On November 12, 1999, the first day Dicom began to trade publicly, Dicom's stock price closed at an adjusted price of $5.08 per share, but by January 11, 2000, the stock closed at $7 per share, a 37.8% increase. During this period, the Stock Promoters issued eight Investment Opinions recommending Dicom stock, and they sold their shares into the artificially inflated market that they helped to create even though they did not disclose their practice of selling shares after issuing an Investment Opinion.  As a result of their scalping, the Stock Promoters reaped substantial trading proceeds.

*

24.     On December 22, 23, and 28, 1999, Welsh, SFS and SIG sold 3,000 Dicom shares at prices ranging from $5.58 to $7 per share, for profits of approximately $34,193.

25.     On December 28, 1999 and on January 3 and 6, 2000, Tamburello and CRG sold 12,000 Dicom shares at prices ranging from $5.75 to $6.81 for profits of approximately $78,062.

## DICOM RESTATES POSITIVE EARNINGS AS LOSSES

26.     On January 11, 2000, Dicom issued a press release announcing that it had restated revenue generated from a license agreement as reported in its Form 10-QSB for the third quarter of fiscal 1999. Gane approved the press release. As a result of the restatement, Dicom's reported revenue of approximately $693,918 was reduced to approximately $97,187, an 86% decline, and Dicom's reported earnings of $248,505, or $0.10 per share, declined to a *loss* of $351,495, or $0.15 per share. Dicom explained that the restatement reflected a change regarding when it actually was to receive the revenue, and further stated that the revenue would be recognized in the first quarter of fiscal year 2000. Under Welsh's direction, SIG issued the press release for Dicom. As a result of the January 11, 2000 press release, Dicom's share price dropped 1.7% that day, from $7.125 to $7, on volume of 11,900 shares. On January 13, 2000, Dicom, through SIG, again issued an announcement that it was restating third quarter revenues and earnings for the same reasons as set forth in the January 11 press release.

27.     The restatement of Dicom's third quarter financials put Gane and the Stock Promoters on notice that Dicom was not meeting its financial goals and that Dicom now appeared unable to execute its three-year plan as set forth in the due diligence package. Dicom reported the following revenue and earnings during the relevant period in its Commission filings.

*

*

- 9 -

28.     On October 28, 1999, Dicom filed its quarterly report with the Commission for the quarter ending June 30, 1999, on Form 10-QSB and reported no revenues, a net loss of $424,491, and a net loss per share of $0.18.

29.     On November 9, 1999, Dicom filed its quarterly report with the Commission for the quarter ending September 30, 1999, on Form 10-QSB and reported no revenues, net income of $248,505, and a net loss per share after taxes of $0.10.

30.     On January 25, 2000, Dicom filed its amended quarterly report with the Commission for the quarter ending September 30, 1999, on Form 10-QSB/A and reported no revenues, a net loss of $600,972, and a net loss per share of $0.24.

31.     On February 10, 2000, Dicom filed its amended quarterly report with the Commission for the quarter ending September 30, 1999, on Form 10-QSB/A and reported no revenues, a net loss of $910,293, and a net loss per share of $0.38.

32.     Despite all of the adverse financial information that Dicom released to the public, Gane and the Stock Promoters nevertheless continued to project strong revenues and earnings for Dicom.

## GANE'S $50 MILLION AND $60 MILLION REVENUE PROJECTIONS ON THE INTERNET AND IN A NATIONALLY SYNDICATED TELEVISION INTERVIEW

33.     On January 13, 2000, Gane conducted two videotaped interviews, one rebroadcast on the Internet by "Wall Street Reporter," whose website was www.wallstreetreporter.com, and the other for a syndicated television program broadcast nationally through several regional outlets of the "Emerging Company Report." Wall Street Reporter and Emerging Company Report feature interviews with spokespersons from companies that pay for the service. The Wall Street Reporter interview was also printed in the March 2000 issue of the Wall Street Reporter magazine. During the interview, Gane stated that Dicom's revenue goal was a 20% share of the dental market in the next two years, which he said would translate into $60 million in revenue over the next two years.

- 10 -

34.     The second interview was televised nationally over the weekend of January 14-16, 2000, and it was available on the broadcaster's website, which was www.emergingcompany.com. In response to a question about Dicom's revenue goals, Gane replied that he and the company were looking at generating $50 million in revenue over the next thirty-six (36) months.

35.     The Gane interview remained on the Internet at Emerging Company Report's website for thirteen (13) weeks and at Wall Street Reporter's website for six months.

36.     As Gane well knew, however, his $50 million and $60 million revenue projections were false and misleading. Neither Dicom's internal projections nor its actual financial results to date supported these projections. The internal projections, which were contained in the business plan and in the due diligence package, predicted revenues of $24.7 million and earnings of $19.7 million in Dicom's first three years of operation. Moreover, the company actually incurred losses during its first six months of operation.

37.     Gane had seen a copy of the business plan and was aware that some of the products upon which Dicom based its revenue and earnings projections were still in development and might not result in revenue or earnings. He had also seen and approved the January 11, 2000 press release announcing that Dicom would be restating its third quarter financial results downward for fiscal 1999 from a gain to a loss. As a result, Gane knew or was reckless in not knowing that his statements to the public about Dicom's revenue projections had no reasonable basis in fact.

### TAMBURELLO ISSUES INVESTMENT OPINIONS AFTER THE RESTATEMENT

38.     On January 13 and 19, 2000, CRG issued additional Investment Opinions written by Tamburello. The Investment Opinions again called Dicom a "great buy," noted a new partnership arrangement with another dental company

and issued a target price of $15 per share.  Tamburello wrote and had CRG issue these Investment Opinions.

### WELSH AND SFS REPEAT GANE'S $50 MILLION PROJECTION WHILE TAMBURELLO AND CRG ISSUE ANOTHER INVESTMENT OPINION

39.     After the January 13 interviews, Welsh and SFS repeated Gane's $50 million revenue projection.  Specifically, Welsh and SFS issued an Investment Opinion on January 25, 2000, in which SFS issued a "strong buy" recommendation, stating that Dicom anticipated generating $50 million in revenues over the next thirty-six (36) months, and set a two-week price target of $10 per share.  Welsh wrote the Investment Opinion.

40.     Also on January 25, 2000, CRG issued its own Investment Opinion, repeating Dicom's earnings projection for its second year of operation, which was over $7 million for 2000 or over $1.00 per share, and setting a short-term price target of $20 per share.  The earnings projection came from Dicom's original projection, which was contained in the business plan and the due diligence package.  Tamburello wrote CRG's Investment Opinion.

41.     Welsh and Tamburello knew, or were reckless in not knowing, that the $50 million revenue projection and the $7 million revenue projection for 2000 were false and misleading.  On January 11 and 13, 2000, two weeks before SFS issued its Investment Opinion, Dicom announced – through SIG – its third quarter restatement.  Additionally, the same day that SFS issued its Investment Opinion, Dicom filed its amended report on Form 10-QSB.  Tamburello did no analysis and conducted no due diligence of Dicom's financial condition before issuing the January 25 Investment Opinion.

### DICOM'S STOCK PRICE INCREASES ON HEAVY VOLUME IN RESPONSE TO THE INTERVIEWS AND THE INVESTMENT OPINIONS

42.     The effects of the January 13 television interview and the Investment Opinions on and after that date were substantial.  Dicom's stock price increased

from a closing price of $7.0625 on January 13, 2002, to a closing price of $8.25 on January 25, 2000, an increase of 16.8%. The January 25 Investment Opinions had a particularly strong effect upon trading volume, which soared 5,469%, from 8,900 shares on January 24 to 495,000 shares on January 25. Dicom's stock price continued to rise on January 26, 2000, from $8.25 to $10 (a rise of 21.2%) on continued heavy volume of 435,000 shares.

### THE STOCK PROMOTERS CONTINUE TO MAKE FINANCIAL PROJECTIONS EVEN IN THE FACE OF DICOM'S SIGNIFICANT LOSSES

43.     The Stock Promoters continued to issue favorable Investment Opinions through February 29, 2000, even though Dicom's financial outlook became even worse as time went by. As set forth above, an examination of Dicom's audited and unaudited financial statements filed with the Commission demonstrated that there was no reasonable basis upon which to make the projections or price predictions contained in the Investment Opinions issued on and after January 25, 2000. Nevertheless, the Stock Promoters issued Investment Opinions that repeated Dicom's financial projections from the business plan, set new and higher price targets for Dicom's stock, or both.

44.     SIG issued two additional Investment Opinions, written by Welsh, on February 16 and February 29, 2000, each of which was a strong buy recommendation. The February 16 Investment Opinion stated that Dicom would meet or even exceed its projected earnings target of over $7 million for 2000, or over $1 per share, even though Dicom was experiencing ever-increasing losses. Each of the SIG Investment Opinions also specified higher targets for Dicom's stock price, namely $20 (February 16) and $30 (February 29).

45.     Welsh knew, or was reckless in not knowing, that Dicom's financial condition grew worse as he continued to issue increasingly favorable Investment Opinions. Welsh deviated from his normal business practice when preparing each of the Investment Opinions. Welsh did not do his normal due diligence on Dicom

- 13 -

before representing the company.  But although Welsh reviewed Dicom's financial statements, had misgivings about Dicom's revenue recognition practices, and doubted that the reported numbers could support the projections, he nevertheless continued to issue favorable Investment Opinions.

46.     CRG issued a total of eleven additional Investment Opinions on February 9 (2 opinions), 11, 14, 17 (2 opinions), 22, 24 (2 opinions), 28 and 29, 2000.  Tamburello wrote each Investment Opinion.  The February 9, 11, 14, 17, and 22 Investment Opinions each stated that Dicom expected to realize over $7 million in earnings during 2000, or over $1 per share, even though Dicom was publicly disclosing losses in its Commission filings.  The February 9, 14, 17, 22, 24, 28 and 29 Investment Opinions called Dicom "a great buy."  The CRG Investment Opinions also specified an increasingly higher target share price for Dicom stock of $15 (February 9), $20 (February 11 and 14), $25 (February 17 and 22), $30 (February 24 and 28) and $40 (February 29).

47.     Tamburello knew, or was reckless in not knowing, that Dicom's financial condition grew worse as he continued to issue increasingly favorable Investment Opinions through CRG.  Tamburello had a practice of looking for a client company's press releases on the Internet.  Such a review would have uncovered both the January 11 and 13, 2000 press releases, which discussed Dicom's restatement from a gain to a loss for the third quarter of fiscal 1999.  In addition, Tamburello never sought nor obtained Gane's approval for the Investment Opinions, even though Dicom was a new client with whom he had not previously worked.  And Tamburello did no analysis of Dicom's financial circumstances to substantiate his projections.

### THE STOCK PRICE INCREASES IN RESPONSE TO THE INVESTMENT OPINIONS

48.     Overall, as a result of the Investment Opinions, the price of Dicom's stock skyrocketed from $8.25 per share on January 25, 2000, to a high of $36 on

\*

March 1, 2000. Furthermore, the statements in the Investment Opinions were repeated on the Internet at financial websites such as Raging Bull.

### THE STOCK PROMOTERS SELL OVER
### $1 MILLION WORTH OF ADDITIONAL DICOM SHARES

49.    As Dicom's stock price continued to increase, the Stock Promoters continued to engage in scalping. From January 11 to April 10, 2000, Tamburello, through CRG, sold an additional 72,000 shares at prices ranging from $7.1875 to $36.25, pocketing trading proceeds of approximately $928,438. Through the CRG account, Tamburello sold Dicom stock on January 25 and 26, February 11, 14, 17, 19, 22, 23, 24, 25, 28, and 29, March 2, 7, 15, and 21, and March 6, 2000. From January 11, 2000 until February 23, 2000, Welsh, through SFS, sold 7,750 additional shares at prices ranging from $7 to $16, for trading proceeds of approximately $74,478. Through the SFS account, Welsh sold Dicom stock on January 11, 13, 14, 18, 19, 21, and 25, and February 9, 10, 11, 14, 16, 17, and 23, 2000. Overall, Tamburello and CRG made approximately $1,006,500 from the sale of Dicom shares, and Welsh, SFS and SIG made approximately $108,671.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
### Violations of Section 17(a) of the Securities Act
### (Against Defendants Welsh, SFS, SIG, Tamburello, and CRG)

50.    The Commission realleges and incorporates by reference paragraphs 1 through 49 above.

51.    Defendants Welsh, SFS, SIG, Tamburello, and CRG, and each of them, by engaging in the above conduct, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a.    with scienter, employed devices, schemes, or artifices to defraud;

- 15 -

b.   obtained money or property by means of untrue statements of a material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

52.   By engaging in the conduct described above, Defendants Welsh, SFS, SIG, Tamburello, and CRG violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**

**SECURITIES TOUTING WITHOUT**

**ADEQUATE DISCLOSURE OF COMPENSATION**

**Violations of Section 17(b) of the Securities Act**

**(Against Defendants Welsh, SFS, SIG, Tamburello, and CRG)**

53.   The Commission realleges and incorporates by reference paragraphs 1 through 49 above.

54.   Defendants Welsh, SFS, SIG, Tamburello, and CRG, and each of them, by engaging in the above conduct, used the means or instruments of transportation or communication in interstate commerce or of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, described such security for consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

*

*

55.    By engaging in the conduct described above, Defendants Welsh, SFS, SIG, Tamburello, and CRG violated, and unless restrained and enjoined, will continue to violate, Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

### THIRD CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE
### PURCHASE OR SALE OF SECURITIES
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder
### (Against Gane, Welsh, SFS, SIG, Tamburello and CRG)

56.    The Commission realleges and incorporates by reference paragraphs 1 through 49 above.

57.    Defendants Gane, Welsh, SFS, SIG, Tamburello, and CRG, and each of them, with scienter, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, or of the mails:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

58.    By engaging in the conduct described above, Defendants Gane, Welsh, SFS, SIG, Tamburello, and CRG violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

### II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining each Defendant and his or its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, for Defendants Welsh, SFS, SIG, Tamburello, and CRG, from violating Sections 17(a) and 17(b) of the Securities Act, and for Defendants Gane, Welsh, SFS, SIG, Tamburello, and CRG, from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III.

Enter an order, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting Gane from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), in that Gane's conduct as alleged herein demonstrates unfitness to serve as an officer or director of a public issuer.

### IV.

Order Defendants Welsh, SFS, SIG, Tamburello, and CRG to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

### V.

Order Defendants Welsh, SFS, SIG, Tamburello, and CRG to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and order

Defendants Gane, Welsh, SFS, SIG, Tamburello, and CRG to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Signed this 13th day of August, 2003.

Respectfully submitted,

Roberto A. Tercero
Senior Counsel
Direct Dial: (323) 965-3891
Facsimile: (323) 965-3908
E-Mail: TerceroR@sec.gov

Gregory C. Glynn
Senior Trial Counsel
Direct Dial: (323) 965-3890
Facsimile: (323) 965-3908
E-Mail: GlynnG@sec.gov

*Attorneys for Plaintiff*

SECURITIES AND EXCHANGE COMMISSION
Randall R. Lee, Pacific Regional Director
Sandra J. Harris, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

- 19 -

JS 44
(Rev. 12/96)

**CIVIL COVER SHEET**

ORIGINAL

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

2003 AUG 13 PM 12: 28

SECURITIES AND EXCHANGE COMMISSION

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

**DEFENDANTS**

SEE ATTACHMENT

03-61553
CIV-SEITZ

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Broward | 03-61553-qu-Seitz/Bandstra

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT British Columbia, Canada
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

MAGISTRATE JUDGE
BANDSTRA

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

SEE ATTACHMENT

ATTORNEYS (IF KNOWN)

SEE ATTACHMENT

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, (BROWARD,) PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

| **II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY) | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF (For Diversity Cases Only) AND ONE BOX FOR DEFENDANT) | | |
|---|---|---|---|
| | | PTF DEF | PTF DEF |
| ☒ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State ☐ 1 ☐ 1 | Incorporated or Principal Place ☐ 4 ☐ 4 of Business In This State |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State ☐ 2 ☐ 2 | Incorporated and Principal Place ☐ 5 ☐ 5 of Business In Another State |
| | | Citizen or Subject of a ☐ 3 ☐ 3 Foreign Country | Foreign Nation ☐ 6 ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

Appeal to District Judge from

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury — Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 690 Other | **B SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 791 Empl Ret Inc Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

SEE ATTACHMENT

LENGTH OF TRIAL
via 2 days estimated (for both sides to try entire case)

| **VII. REQUESTED IN COMPLAINT:** | CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23 | **DEMAND $** | CHECK YES only if demanded in complaint: |
|---|---|---|---|
| | | | **JURY DEMAND:** ☐ YES ☒ NO |

**VIII. RELATED CASE(S)** (See instructions):
**IF ANY**

JUDGE _____ DOCKET NUMBER _____

DATE
August 13, 2003

SIGNATURE OF ATTORNEY OF RECORD
Roberto A. Quercia

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## SEC v. DAVID GANE, et al.
## United States District Court - Southern District of Florida


Attachment to Civil Cover Sheet


**I.(a)  DEFENDANTS**

David Gane (British Columbia, Canada), Jeffrey D. Welsh, Southern
Financial Services, Inc., Southern Waste, Inc., dba Strategic Investors
Group, Charles T. Tamburello, and Capital Research Group, Inc.


**I.(c)  ATTORNEYS (Plaintiff)**

Gregory C. Glynn, Esq.
Roberto A. Tercero, Esq.
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908
*Attorneys for Plaintiff Securities and Exchange Commission*


**ATTORNEYS (Defendants)**

Jeffrey B. Maletta, Esq.
Stavroula E. Lambrakopoulos, Esq.
Kirkpatrick & Lockhart LLP
1800 Massachusetts Avenue, N.W.
Washington, DC 20036
Telephone: (202) 778-9000
Facsimile: (202) 778-9100
*Attorneys for Defendant s Charles T. Tamburello and Capital Research*
*Group, Inc.*

Jeffrey Tew, Esq.
Tew, Cardenas, LLP
Miami Center - Suite 2600
201 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 577-3900
Facsimile: (305) 577-9911
***Attorneys for Defendant s Charles T. Tamburello and Capital Research
Group, Inc.***

## VI.   CAUSE OF ACTION

The Complaint alleges violations of the federal securities laws.  15 U.S.C. §
77q(a); 15 U.S.C. § 77q(b); 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5
thereunder.